IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kyle B. Oberdick,                         :
                          Petitioner      :
                                          :
          v.                              :
                                          :
Pennsylvania Parole Board,                :    No. 1381 C.D. 2025
                          Respondent      :    Submitted: February 24, 2026

BEFORE:     HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE STELLA M. TSAI, Judge
            HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE TSAI                             FILED: March 23, 2026


          Petitioner Kyle B. Oberdick (Oberdick) petitions for review of a final
determination of the Pennsylvania Parole Board (Board), mailed on September 25,
2025.  The Board denied Oberdick's request for administrative relief, thereby
rejecting his claim that the Board erred by recommitting him as a technical parole
violator (TPV) based on his unsuccessful discharge from a community corrections
center.  For the reasons set forth below, we now affirm.

          Oberdick pled guilty to aggravated assault with bodily injury to an officer,
and the Court of Common Pleas of Lackawanna County sentenced him to a term of
incarceration of one year and one month to three years.  Certified Record (C.R.) at 1.
His maximum sentence date was April 15, 2026.  *Id.*  The Board granted Oberdick
parole, and he was released from the State Correctional Institution (SCI)-Rockview
to the Harrisburg Community Corrections Center on June 5, 2024.  *Id.* at 6.  The
Board imposed various conditions of parole on Oberdick.  *Id.* at 7-12.  On August

13, 2024, the Board issued a warrant to commit and detain him, and it recommitted Oberdick as a TPV to serve six months for a technical violation of parole by decision recorded on August 26, 2024. *Id.* at 13-17. In so doing, the Board calculated his maximum parole violation date as April 15, 2026. *Id.* at 14-19.

On February 13, 2025, the Board reparoled Oberdick, this time releasing him from SCI-Smithfield to Keystone Corrections Services, Inc. (Keystone) in Harrisburg, Pennsylvania. *Id.* at 20-21. Special condition number 7 of Oberdick's parole required him to abide by all the rules and regulations of Keystone and to successfully complete the Keystone program as determined by Keystone staff and/or parole supervision staff. *Id.* at 32. "Any discharge, termination or separation other than successful discharge shall constitute a violation of . . . parole." *Id.*

On May 9, 2025, Keystone discharged Oberdick without him having successfully completed its program. *Id.* at 36. According to the Board's notice of charges and hearing, as reasons for the discharge, Keystone asserted that Oberdick engaged in (1) "physically assaultive and destructive behavior," (2) "threatening an employee or other person with bodily harm," and (3) "constituting an identifiable threat in violation of [its] rules." *Id.* The Board issued a warrant to commit and detain Oberdick that same day and charged him with a technical parole violation of parole condition number 7.[1] *Id.* at 35-36.

---

[1] The Board's Supervision History documents the relevant period of Oberdick's parole to Keystone as follows:

> On 5-6-2025, the offender received a write up from Keystone staff for being verbally assaultive and disruptive during a random urinalysis process. The offender stated to the [K]eystone monitor, "One of these days I am going to go off and then they'll see." The offender was then held in without any reason to leave Keystone until it was determined by parole staff how to proceed with sanctioning.

The Board conducted a parole violation hearing on July 11, 2025, at which the Board received testimony from Steven Padilla (Padilla), Jeffrey Troutman (Troutman), and Oberdick relating to Oberdick's alleged violation of parole condition number 7 for being unsuccessfully discharged from Keystone. *Id.* at 45-77.

Padilla, a supervisor at Keystone, testified to an encounter with Oberdick on the evening of May 8, 2025. *Id.* at 53-56. Padilla testified that the staff at Keystone was in the middle of handing out medications, when Oberdick asked for a dinner tray. *Id.* at 54. Padilla asked Oberdick to please give staff a little time because they were in the middle of dispensing medications. *Id.* According to Padilla, meal trays were usually distributed around 7:00 or 7:30. *Id.* Padilla testified that he told Oberdick that staff would hand out trays as soon as they finished handing out medications. *Id.* Padilla stated that Oberdick "got upset and argued back with [Padilla] after [Padilla] told [Oberdick] that [Padilla] needed him to wait until [they] were done with med[ications], [Oberdick] slammed the door that enters back into the east side housing unit. [Oberdick] slammed the door open and it bounced off the wall, making a loud bang." *Id.* at 54-55.

---

On 5-8-2025, the offender approached the main control desk and demanded a lunch tray because he was hungry. It was explained to the offender that it would be a minute due to control staff running the medication line. The offender then slammed the east side door open and bounced himself off the wall in the secured hallway saying "I'm [expletive] hungry I was in the shower during dinner at 1730 hours just do you [expletive] job." After this incident occurred, the offender called 911 for EMS services. EMS arrived and the offender was being escorted by Supervisor Padilla out of the building. The offender commented to Supervisor Padilla, "I'm checking myself in, I'm out of my psych meds, I already assaulted a parole agent in the past, I don't have an issue assaulting someone else." At this time, Keystone director moved forward with an unsuccessful discharge for safety of [K]eystone staff as well as parole staff.

C.R. at 43.

Padilla also testified to another incident later that evening. *Id.* at 55-56. As to that incident, Oberdick requested an ambulance to take him to a hospital. When EMS arrived, Oberdick "said something along the lines of he wanted to check himself in because he said he was out of psych med[ications]." *Id.* at 55. When EMS arrived, "he said something along the lines that he had already assaulted a parole agent in the past and that he didn't have issues assaulting somebody else again." *Id.* Padilla acknowledged that Oberdick stated that "he didn't mean it," but Padilla explained that it was hard to know whether he meant it given the earlier interactions Padilla had with Oberdick that evening. *Id.* at 55-56.

Padilla further testified that, following those incidents, he issued Oberdick a "BCC[-]141[A]" form for each incident. *Id.* at 56. The BCC-141A form is a form created by the Department of Corrections entitled "Bureau [o]f Community Corrections Resident Infraction Report." *Id.* at 79-80. The BCC-141A form is used by a community corrections center to report resident infractions, and the form includes a list of nineteen different bases for an infraction that may be checked by "reporting staff," along with an area to provide a written summary of the infraction. *Id.* The Board introduced the BCC-141A forms completed by Padilla. *Id.* On the form pertaining to Oberdick's demand for a dinner tray, Padilla checked the boxes for the following infractions: "Physically Assaultive/Destructive Behavior;" "Using Abusive, Obscene, Inappropriate Language;" and "Failure to Follow Center Rules/Direction Given by Staff." *Id.* at 80. On the form pertaining to Oberdick's 911 call and interaction with Padilla and EMS, Padilla checked the boxes for "Physically Assaultive/Destructive Behavior," "Threatening an Employee or Other Person with Bodily Harm," and "Other Identifiable Threat." *Id.* at 79. Moreover, on the form pertaining to the 911 call and EMS, Troutman, as the center director,

indicated that he was "Unsuccessful[ly] Discharg[ing]" Oberdick from Keystone's program. *Id.* Counsel for Oberdick objected to the admission of those documents to the extent that they discussed the summary of the infractions. *Id.* at 57. The hearing officer admitted the documents for documentation purposes but stated he would rely on the testimony of witnesses and not consider the narrative in the documents. *Id.* at 58.

On cross-examination, Padilla testified that the first incident happened around 6:20 or 6:30, and the second incident happened around 7:00 or 20 or 30 minutes later. *Id.* at 59-60. Between the incidents, Oberdick went back to the east side housing unit and trays were served afterwards. *Id.* at 60. As to Oberdick's statement that he had previously assaulted a parole agent and did not have any issues doing it again, Padilla explained that Oberdick was upset when he said it, and Padilla interpreted the statement as a direct threat due to Oberdick's aggressive behavior earlier that evening. *Id.* at 61-62.

Troutman, Keystone's facility director, testified that he received and reviewed the reports relating to Oberdick's incidents and then requested an unsuccessful discharge from Keystone's program. *Id.* at 65-66. He identified the violations as "threatening an employee or other person with bodily harm," "physical[] assault o[r] destructive behavior," and "other identifiable threat." *Id.* at 67. On cross-examination, Troutman testified that he made the decision to unsuccessfully discharge Oberdick based on the reports. *Id.* at 68. When asked whether he based his decision on statements from Padilla, he responded that he did not; rather, he made his decision based on the reports. *Id.* He did not speak with Padilla. *Id.* at 69.

Oberdick testified that once he arrived at the hospital's psychiatric unit, he told the doctor that he was having issues with Keystone and wanted to talk to

someone to get the help he needed. *Id.* at 70. The doctor, however, did not agree to refer him to an inpatient facility; instead, the doctor discharged him, and Oberdick returned to Keystone via ride share. *Id.* at 70-71. Oberdick explained that he wanted to be at a facility in the York area where he would have support. *Id.* at 71-72. As to his comments to the EMTs, he stated that he "was just telling them about [his] past . . . mental health diagnosis is that [he has] Asperger's, and then [he] was out of [his] meds for like a couple weeks to a month." *Id.* at 72. He asserted that Keystone would not help him get his medications, and he did not get them at the hospital. *Id.* at 73. Once he returned to an SCI, he received medications. *Id.* He did not recall saying anything about previously assaulting a parole officer and not having any issues doing it again. *Id.* at 73-74. He testified that he was upset because he felt like he was not getting the help he needed, and he wanted to transfer to be near his family and receive mental health treatment. *Id.* at 74.

By Board action recorded on July 23, 2025, the Board recommitted Oberdick as a TPV to serve nine months for violation of condition number 7, having been unsuccessfully discharged from Keystone.[2] *Id.* at 103. The Board recalculated his maximum parole violation date as April 15, 2026. *Id.* Oberdick sought administrative relief, which the Board denied by decision mailed on September 25, 2025. *Id.* at 111-12. As to Oberdick's violation of parole condition number 7, the Board explained:

> The Board determined that sufficient evidence was presented at the July 11, 2025 violation hearing to recommit you for violating condition #7, (unsuccessfully discharged from Keystone . . . ). . . . Padilla stated that Oberdick wanted his dinner tray. Padilla said Oberdick would have to wait for the dinner tray until meds were done. Oberdick left slamming the door to the unit. The door hit the wall with a loud bang. Padilla

---

[2] In the hearing report, the hearing officer characterized Oberdick's violation as "assaultive" or "includ[ing] a credible threat to cause bodily injury to another." C.R. at 91.

said later that day, EMS arrived at the facility for Oberdick. Oberdick wanted to check himself in because he was out of medication. Padilla testified that Oberdick had stated he assaulted a parole agent before and did not have an issue about doing it again. Padilla filled out the BCC[-]141[A] (two copies) and submitted [them] to . . . Troutman. . . . Troutman reviewed the reports and as a result unsuccessfully discharged . . . Oberdick from the Keystone . . . . Troutman testified . . . Oberdick was discharged due to physical/destructive behavior, using abusive, obscene, or threatening language, and failure to follow rules. Upon review, the appeal panel finds that the evidence presented constitutes substantial evidence to support the recommitment. The fact that the Board chose to believe the testimony/evidence presented in favor of the violation and not to accept [Oberdick's] story is not subject to challenge.

*Id.* at 111. Oberdick then petitioned this Court for review.

On appeal to this Court,[3] Oberdick argues that the Board's decision is not supported by substantial evidence because the discharge paperwork from Keystone is not supported by the testimony presented at the violation hearing. More specifically, Oberdick argues that the testimony received by the Board during the violation hearing regarding the incidents that occurred at Keystone is inconsistent with the resident infraction reports completed by Keystone's staff. Oberdick essentially maintains that the hearing testimony supports a finding that he was discharged from Keystone, but the testimony does not support the reasons for the discharge as listed on the resident infraction reports. Oberdick seems to imply that this discrepancy calls into question the appropriateness of his discharge, such that substantial evidence does not exist to support the Board's finding that he violated

---

[3] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. 2 Pa. C.S. § 704. "Substantial evidence is defined as evidence that a reasonable mind would find sufficient to support a conclusion." *Smalls v. Pa. Bd. of Prob. & Parole*, 823 A.2d 274, 275 (Pa. Cmwlth. 2003).

condition number 7 of his parole. Thus, he contends that the Board erred in recommitting him as a TPV.

"In parole violation proceedings, the burden of proof is upon the Board to show by a preponderance of the evidence that the parolee violated the terms and conditions of parole." *Sigafoos v. Pa. Bd. of Prob. & Parole*, 503 A.2d 1076, 1079 (Pa. Cmwlth. 1986). This means that "[t]he Board must prove a technical parole violation by a preponderance of the evidence." *Smalls*, 823 A.2d at 275. "A preponderance of the evidence is 'such proof as leads the fact[]finder . . . to find that the existence of a contested fact is more probable than its nonexistence.'" *Id.* (quoting *Sigafoos*, 503 A.2d at 1079). "It is the function of the Board as fact[]finder, and not this Court, to weigh the evidence, make witness credibility determinations, and resolve conflicts in the evidence." *Baker v. Pa. Bd. of Prob. & Parole*, 529 A.2d 1164, 1166 (Pa. Cmwlth. 1987).

Moreover, "in order to prove a [technical] violation of a condition of parole[,] the Board is required to demonstrate that the petitioner was at least somewhat at fault for the technical parole violation." *Hudak v. Pa. Bd. of Prob. & Parole*, 757 A.2d 439, 440-41 (Pa. Cmwlth. 2000), *appeal denied*, 771 A.2d 1291 (Pa. 2001). In *Hudak*, this Court observed that a parolee exercises "free will or his or her choice" over his or her actions, but "whether a parolee is kept in a program or discharged from the program may be completely outside of a parolee's control." *Id.* at 442. "[I]f a parolee is not at fault, such as being discharged from a program because of reasons beyond his control, . . . the Board cannot recommit the parolee[,] as this would constitute an abuse of authority." *Id.* Thus, we held in *Hudak* that, "in cases where the Board has fashioned a condition of parole over which the petitioner does

8

not have control, the Board must show that the petitioner was somewhat at fault in order to prove a violation." *Id.*

The gist of Oberdick's argument seems to be that the basis for his discharge—*i.e.*, that he (1) engaged in physically assaultive[4] or destructive behavior, (2) threatened an employee or other person with bodily harm, and (3) constituted an identifiable threat, as set forth in the relevant BCC-141A—is not supported by substantial evidence of record. Oberdick, although making this argument, does not flesh out his assertion that substantial evidence is lacking. For instance, he does not assert that his statement to Padilla and EMS about previously assaulting an officer, which is the incident that resulted in his discharge, cannot be considered assaultive, a threat of bodily harm, or an identifiable threat. Padilla testified to the statement and his interpretation of that statement based upon his observation of Oberdick at that time and based upon his observation of Oberdick shortly beforehand when Oberdick demanded his dinner tray. Padilla interpreted Oberdick's statement as a direct threat. Padilla's testimony constitutes substantial evidence that Oberdick's statement was physically assaultive in nature in that it was an identifiable threat of bodily harm. Padilla's testimony, therefore, constitutes substantial evidence in support of the reasons stated for Oberdick's discharge. Thus, we must conclude that Oberdick's argument lacks merit.

Accordingly, we affirm the order of the Board.

_____
STELLA M. TSAI, Judge

---

[4] The word "assaultive" is defined as "relating to, or tending toward assault," and is often used to describe behavior. *Assaultive*, Merriam-Webster's Collegiate Dictionary 73 (11th ed. 2024).

9

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kyle B. Oberdick,
                Petitioner

      v.

Pennsylvania Parole Board,
                Respondent    :    No. 1381 C.D. 2025

## **O R D E R**

AND NOW, this 23rd day of March, 2026, the order of the Pennsylvania Parole Board is AFFIRMED.

_____
STELLA M. TSAI, Judge